292 N.J. Super. 391 (1996)
678 A.2d 1165
JONATHAN SINGER, PLAINTIFF-RESPONDENT,
v.
COMMODITIES CORPORATION (U.S.A.), DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 1996.
Decided July 23, 1996.
*395 Before Judges MICHELS, VILLANUEVA and KIMMELMAN.
John K. Bennett argued the cause for appellant (Carpenter, Bennett & Morrissey, attorneys; Cahill, Gordon & Reindel, of the New York Bar, Mr. Bennett, Laurence A. Silverman of the New York Bar, and Leonard A. Spivak, of the New York Bar, of counsel; Mr. Bennett, Thomas C. Bigosinski, Mr. Silverman, Mr. Spivak, William F. Dahill, of the New York Bar, and James R. Anderson, of the New York Bar, on the brief).
Nancy Erika Smith argued the cause for respondent (Smith & Mullin, attorneys; Ms. Smith, of counsel; Ms. Smith and Christopher P. Lenzo, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendant Commodities Corporation (U.S.A.), pursuant to leave granted by this court, appeals from an order of the Law Division that denied its motion to compel plaintiff Jonathan Singer to submit his employment-related disputes to arbitration before the National Association of Security Dealers (NASD) and to stay litigation pending completion of that NASD arbitration; and from an order that denied its motion for reconsideration.
The record submitted on appeal shows that pursuant to an employment agreement dated February 7, 1992, plaintiff was employed, effective January 1, 1992, as Vice President of Securities Trading Limited (STL), a subsidiary of defendant. In this capacity, plaintiff was responsible for managing the trading activities of STL at its New York trading office. STL is the sole general partner of Hamilton Partners, L.P. (Hamilton), a limited partnership formed under Bermuda law, with its principal place of business in Hamilton, Bermuda. Hamilton is a United States broker-dealer registered with the Securities and Exchange Commission (SEC) and is a NASD member. Hamilton has no employees of its own. Until December 1, 1994, all securities trading *396 activities by and on behalf of Hamilton in New York were performed by employees of STL.
On November 6, 1991, prior to entering into the employment agreement with STL, plaintiff executed a "Uniform Application For Securities Industry Registration or Transfer", a form commonly referred to as a "Form U-4." Beneath a caption which read: "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY", the Form U-4 provided:
I apply for registration with the jurisdictions and organizations indicated in Item 10 as may be amended from time to time and, in consideration of the jurisdictions and organizations receiving and considering my application, I submit to the authority of the jurisdictions and organizations and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the jurisdictions and organizations as they are or may be adopted, or amended from time to time. I further agree to be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by the jurisdictions and organizations, subject to right of appeal or review as provided by law.
* * * * * * * *
I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.
The NASD is one of the organizations referred to in Item 10.
Although plaintiff acknowledges that he received the Form U-4 by mail in November 1991, he maintains that defendant never explained to him that in signing the Form U-4 he waived, by virtue of the term mandating that any disputes be submitted to arbitration, his right to bring a lawsuit against his employer. Plaintiff "thought the form was for law enforcement purposes."
According to plaintiff, the specific facts giving rise to the employment dispute here at issue commenced in the spring of 1994. Plaintiff maintains that shortly after March 31, 1994, defendant, in order to increase its investment, obtained a $60 million loan from Citibank and First Chicago (the banks) for an affiliate. According to plaintiff, the loans were predicated on the affiliate's *397 net equity. Thus, the loan agreements provided for recall of the entire loan if Hamilton's unit value decreased by 25% from its peak level. The loan agreements also provided for accelerated payments or loan recall if the affiliate's financial status declined to threshold levels, and required notice to the banks of such change.
In the spring of 1994, plaintiff became concerned that Jeff Parket, one of the firm's portfolio managers, was assigning inaccurate prices to the securities in the portfolios he managed. Plaintiff claimed that shortly thereafter, he notified defendant of Parket's questionable pricing practices.
In November 1994, Parket complained that requiring him to hedge (insure) his securities was interfering with his ability to trade. Plaintiff instructed Parket that "until liquidity returns positions had to be hedged." According to plaintiff, relieving Parket of the hedging requirement would have adversely affected the firm's minimum capital requirement, which, plaintiff, as Compliance Officer, was responsible for monitoring. Hamilton, as a broker/dealer, was required to maintain a capital position equal to 120 percent of its minimum regulatory capital requirement. If the capital position fell below this level, the firm was required to notify the SEC that it was in "financial difficulty."
On December 1, 1994, all personnel and assets of STL's New York City office were assigned to defendant, which was a Netherlands Antilles corporation and an affiliate of STL. Accordingly, plaintiff's employment agreement was assigned to defendant and plaintiff became defendant's employee at its New York trading office. On that date, defendant became the investment advisor and agent to effect transactions on Hamilton's behalf.
On or about December 1, 1994, plaintiff allegedly raised questions with Jacob Rosengarten, defendant's risk manager, about the overvaluation of securities in the non-investment grade portfolio. These questions involved plaintiff's late November 1994 concern that the prices Parket had assigned to the securities in the non-investment grade portfolio were inflated and not supportable.
*398 Plaintiff alleged that in a January 4, 1995, meeting which included Parket and Michael Garfinkle, defendant's Head of Trading Administration, "Parket admitted that his pricing of the securities (including bonds) in his portfolios could be inaccurate because they were illiquid (not trading)." Plaintiff further alleged that he and Garfinkle began a pricing audit of Parket's positions on January 13, 1995 which disclosed on January 23, 1995, that "Parket had valued the portfolio about $8 million higher than the industry standard." On January 27, 1995, plaintiff called Pat Fallon, the chief accountant, and discussed the possibility of Parket deliberately mispricing his positions, thereby hiding losses. Parket resigned on January 31, 1995.
On February 1, 1995, plaintiff claimed that he participated in a conference call which included, inter alia, Tom Dailey, the president of Hamilton, Bob Easton, defendant's President, and Roch Hillenbrand, defendant's Chief Financial Officer, at which time he and Garfinkle explained Parket's actions. During this conference call, when plaintiff asked if the banks should be informed of the financial change, Hillenbrand apparently refused to do so.
The next day, February 2, 1995, plaintiff allegedly expressed concerns to Dailey, Easton, Hillenbrand and others about defendant's regulatory capital position and indicated that defendant should so inform the NASD. Plaintiff claimed that during his conversation with these individuals, he stated that due to Parket's actions the firm was caused to have filed inaccurate NASD financial statements. Plaintiff maintains that on February 2, 1995, when he traded Parket's positions, he confirmed that Parket had grossly overpriced his portfolios and had thereby hidden significant losses. On February 5, 1995, Garfinkle was called to defendant's Princeton office and told to terminate plaintiff, and in fact, plaintiff was terminated that day.
On June 7, 1995, plaintiff sent defendant a copy of a complaint that he intended to file against it in the Law Division on June 14, 1995. In the complaint, plaintiff charged that defendant wrongfully terminated his employment in violation of the Conscientious *399 Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq., and defamed him in a report to the NASD which had set forth the reasons for his termination. Plaintiff alleged in the complaint that "[a]s a result of defendant['s] wrongful acts, [he] has suffered and continues to suffer loss of earnings and other employment benefits, as well as damage to reputation and severe mental anguish, stress, humiliation, and pain." Plaintiff sought (1) reinstatement to his position as General Securities Principal and Compliance Officer with backpay and interest and/or prospective lost wages; (2) retroactive restoration of seniority and all employee benefits; (3) compensatory damages; (4) damages for harm to reputation; (5) punitive damages; and (6) attorney's fees and costs.
On June 12, 1995, before plaintiff filed and served the complaint in this action, Hamilton and defendant filed a Statement of Claim with the NASD entitled "In the Matter of the Arbitration Between Hamilton Partners L.P. and Commodities Corporation (U.S.A.) N.V., Claimants, and Jonathan Singer, Respondent", in which they sought a determination that plaintiff had not been wrongly terminated or defamed. They claimed that plaintiff was discharged because:
(1) he directed the execution of an unauthorized trading strategy consisting of the acquisition of well over 100% of a publicly traded junk bond issue (the "junk bond issue") and refused to disclose his bond acquisition strategy to anyone outside of his office unless secrecy was maintained as to identified members of Hamilton Partners L.P. ("Hamilton") senior management, who were members of Claimants' Risk Control Committee, and (2) he engaged in a pattern of conduct that caused the disruption of his office and forced the resignation of a most valued trader of the Claimants, who was under his supervision.
On June 16, 1995, plaintiff instituted this action by filing the aforementioned complaint in the Law Division. On June 19, 1995, the NASD notified plaintiff that the claims set forth in Hamilton's and defendant's Statement of Claim were subject to the arbitration provisions of the NASD Code. On July 5, 1995, plaintiff served defendant with a copy of the summons and complaint in this action. Defendant immediately moved in the Law Division pursuant to R. 4:6-2 and R. 4:52-6, the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1-9, and the New Jersey Arbitration Act *400 (NJAA), N.J.S.A. 2A:24-1 to 4, for an order compelling plaintiff to submit his claims to arbitration before the NASD and for a stay of the action pending the outcome of the NASD arbitration. The trial court denied the motion, stating in part:
Plaintiff correctly notes that at the time he signed the Form U-4 the NASD Code of Arbitration Procedure did not explicitly provide for the arbitration of employment disputes. It was not until October 1, 1993 that the NASD amended sections one and eight of its code, "to clarify that employment-related disputes are arbitratable under the code."
The trial court, although recognizing the general "policy preferences in favor of allowing matters or compelling matters to proceed to arbitration and in favor of conserving scarce judicial resources[,]" nonetheless concluded that "[n]o party can be required to submit a dispute to arbitration which it has not agreed to submit." The trial court rejected defendant's argument that in signing the Form U-4 plaintiff agreed to abide by the existing arbitration provisions of the Code as well as the Code as it "may be amended from time to time." The trial court held that it "would be highly inequitable and controvert the intentions of the parties at the time of contracting to hold plaintiff to the literal terms of that provision." Defendant's motion for reconsideration was denied.
We granted defendant leave to appeal. Defendant seeks a reversal of the order and a declaration instructing plaintiff to submit all employment-related claims and disputes to the NASD for arbitration, including but not limited to those asserted in the trial court, and that the matter be stayed pending the final disposition of the NASD arbitration. Defendant contends, among other things, that the trial court's failure to enforce the employment agreement as written and executed is contrary to federal and New Jersey law favoring arbitration. We agree and reverse.

I.
It is a well-accepted principle that New Jersey supports the settlement of disputes by arbitration. This support is evidenced by N.J.S.A. 2A:24-1, which, in pertinent part, states:

*401 A provision in a written contract to settle by arbitration a controversy that may arise therefrom or a refusal to perform the whole or a part thereof or a written agreement to submit, pursuant to section 2A:24-2 of this title, any existing controversy to arbitration, whether the controversy arise out of contract or otherwise, shall be valid, enforceable and irrevocable, except upon such grounds as exist at law or in equity for the revocation of a contract.
In Kalman Floor Co., Inc. v. Jos. L. Muscarelle, Inc., 196 N.J. Super. 16, 26, 481 A.2d 553 (App.Div. 1984), aff'd o.b., 98 N.J. 266, 486 A.2d 334 (1985), this court noted that New Jersey courts "have accepted the statute as reflecting a public policy favoring commercial arbitration." See Barcon Assocs., Inc. v. Tri-County Asphalt Corp., 86 N.J. 179, 186, 430 A.2d 214 (1981); Hudik-Ross, Inc. v. 1530 Palisade Ave. Corp., 131 N.J. Super. 159, 166, 329 A.2d 70 (App.Div. 1974); see also Ohio Casualty Ins. Co. v. Benson, 87 N.J. 191, 196, 432 A.2d 905 (1981).
Indeed, "our courts have long favored the settlement of disputes by arbitration." Stigliano v. Saint Rose High Sch., 198 N.J. Super. 520, 529, 487 A.2d 1260 (App.Div. 1984); see also Marchak v. Claridge Commons, Inc., 134 N.J. 275, 281, 633 A.2d 531 (1993); Perini Corp. v. Greate Bay Hotel & Casino, Inc., 129 N.J. 479, 489, 610 A.2d 364 (1992); Faherty v. Faherty, 97 N.J. 99, 105-06, 477 A.2d 1257 (1984); Barcon Assocs., Inc., supra, 86 N.J. at 186, 430 A.2d 214; Rivers v. Gen. Accident Group, 192 N.J. Super. 355, 360, 470 A.2d 19 (App.Div. 1983); Johowern Corp. v. Affiliated Interior Designers Inc., 187 N.J. Super. 195, 199, 453 A.2d 1370 (App.Div. 1982); Hudik-Ross, Inc., supra, 131 N.J. Super. at 166, 329 A.2d 70. Thus, our courts have held that an arbitration agreement "should be read liberally in favor of arbitration." Marchak, supra, 134 N.J. at 282, 633 A.2d 531; see also J. Baranello & Sons, Inc. v. City of Paterson, 168 N.J. Super. 502, 506-07, 403 A.2d 919 (App.Div.), certif. denied, 81 N.J. 340, 407 A.2d 1214 (1979); Moreira Constr. Co., Inc. v. Wayne Tp., 98 N.J. Super. 570, 576, 238 A.2d 185 (App.Div.), certif. denied, 51 N.J. 467, 242 A.2d 15 (1968). In Yale Materials Handling Corp. v. White Storage & Retrieval Systems, 240 N.J. Super. 370, 375, 573 A.2d 484 (App.Div. 1990), this court stated that

*402 [i]f New Jersey's strong policy to encourage arbitration is to be meaningful, our decision should favor arbitration where parties have clearly expressed by contract an intention that certain of their disputes should be resolved by arbitration but have ambiguously or less clearly identified those issues which need not be so resolved.
However, while liberally recognizing arbitration agreements, we have held that "it is equally true that the duty to arbitrate, and the scope of arbitration, are dependent solely upon the parties' agreement." Cohen v. Allstate Ins. Co., 231 N.J. Super. 97, 100-01, 555 A.2d 21 (App.Div.), certif. denied, 117 N.J. 87, 563 A.2d 846 (1989); see also Grover v. Universal Underwriters Ins. Co., 80 N.J. 221, 228-29, 403 A.2d 448 (1979); Verbiest v. New Jersey Full Ins. Underwriting Ass'n, 256 N.J. Super. 85, 88, 606 A.2d 420 (App.Div. 1992); Moreira Constr. Co., Inc., supra, 98 N.J. Super. at 575-76, 238 A.2d 185. "Honoring an agreement to submit a matter to arbitration is consistent with the premise that, as long as the agreement does not violate public policy, parties may bargain freely." Marchak, supra, 134 N.J. at 281-82, 633 A.2d 531; see also Faherty, supra, 97 N.J. at 105, 477 A.2d 1257; Life Ins. Co. v. Hocroft Assocs., 256 N.J. Super. 328, 332, 606 A.2d 1150 (Ch.Div. 1992).
In the interpretation of arbitration clauses, the courts have relied upon basic contract principles. A "submission to arbitration is essentially a contract, and the parties are bound to the extent of that contract." Local 462, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. C. Schaefer & Sons, Inc., 223 N.J. Super. 520, 525, 539 A.2d 295 (App.Div. 1988); see also Mitchell v. Alfred Hofmann, Inc., 48 N.J. Super. 396, 405, 137 A.2d 569 (App.Div.), certif. denied, 26 N.J. 303, 139 A.2d 589 (1958); Andrews v. Allstate Ins. Co., 280 N.J. Super. 198, 203, 654 A.2d 1039 (Law Div. 1994). Our courts generally recognize their obligation to "enforce contracts as made by the parties." Vasquez v. Glassboro Serv. Ass'n Inc., 83 N.J. 86, 101, 415 A.2d 1156 (1980); see also Marchak, supra, 134 N.J. at 281, 633 A.2d 531. Moreover, our Supreme Court has held that "[w]hen reading a contract, our goal is to discover the intention of the parties." *403 Marchak, supra, 134 N.J. at 282, 633 A.2d 531. Generally, courts "consider the contractual terms, the surrounding circumstances, and the purpose of the contract." Ibid; see also Jacobs v. Great Pac. Century Corp., 104 N.J. 580, 586, 518 A.2d 223 (1986); Nitta v. Joe Mitsuo Yamamoto, 31 N.J. Super. 578, 580, 107 A.2d 515 (App.Div. 1954).
However, our courts have also warned against rewriting "a contract to broaden the scope of arbitration ... [because] parties may agree to shape and limit the scope of arbitration in their contract." Yale Materials, supra, 240 N.J. Super. at 374, 573 A.2d 484; see also Cohen v. Allstate Ins. Co., supra, 231 N.J. Super. at 101, 555 A.2d 21; Moreira Constr. Co., Inc., supra, 98 N.J. Super. at 576, 238 A.2d 185. In Marchak, supra, 134 N.J. at 282, 633 A.2d 531, our Supreme Court observed that "[a] clause depriving a citizen of access to the courts should clearly state its purpose. The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." Thus, "[i]n the absence of a consensual understanding, neither party is entitled to force the other to arbitrate their dispute. Subsumed in this principle is the proposition that only those issues may be arbitrated which the parties have agreed shall be." Grover v. Universal Underwriters Ins. Co., supra, 80 N.J. at 228-29, 403 A.2d 448.
Furthermore, our courts have determined that "New Jersey law [is] consonant with federal law which liberally enforces arbitration agreements." Yale Materials, supra, 240 N.J. Super. at 375, 573 A.2d 484; see also Kalman Floor Co., Inc., supra, 196 N.J. Super. at 27, 481 A.2d 553. This liberality in interpretation is due, in large measure, to the FAA. In Yale Materials, supra, 240 N.J. Super. at 376, 573 A.2d 484, recognizing the need to apply federal law, we noted that "[t]he federal cases, which are indisputedly here applicable by reason of the broad reach of the Federal Arbitration Act, 9 U.S.C.A. § 1, et seq., strongly hold that ambiguities in agreements are to be resolved in favor of arbitration."
*404 The FAA, which applies to all contracts evidencing a transaction involving interstate commerce, in pertinent part, provides:
A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
[9 U.S.C.A. § 2.]
See also Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158, 163 (1985).
The FAA reversed the long-standing judicial presumption against agreements to arbitrate disputes and placed them "upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26, 36 (1991); see Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488, 497 (1989); Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270, 276 (1974). The Supreme Court has held that where the trial court determines that the parties have agreed to arbitrate, the FAA leaves no room for judicial discretion because it "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, supra, 470 U.S. at 218, 105 S.Ct. at 1241, 84 L.Ed.2d at 163.
It is firmly settled that the FAA preempts state law and that state courts cannot apply state statutes that invalidate arbitration agreements. Allied-Bruce Terminix Cos. Inc. v. Dobson, ___ U.S. ___, ___, 115 S.Ct. 834, 838, 130 L.Ed.2d 753, 763 (1995) (citing Southland Corp. v. Keating, 465 U.S. 1, 15-16, 104 S.Ct. 852, 860-61, 79 L.Ed.2d 1 (1984)). Nonetheless, the FAA specifically permits states to "regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause `upon such grounds as exist at law or in equity for the revocation of any contract.'" Allied-Bruce *405 Terminix Cos. Inc., supra, ___ U.S. at ___, 115 S.Ct. at 843, 130 L.Ed.2d at 769 (quoting 9 U.S.C. § 2).
In First Options of Chicago, Inc. v. Kaplan, ___ U.S. ___, ___, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985, 993 (1995), the Supreme Court held that when deciding whether the parties agreed to arbitrate "courts generally ... should apply ordinary state-law principles that govern the formation of contracts." The Supreme Court has further held that "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act ... due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Volt Info. Sciences, Inc., supra, 489 U.S. at 475-76, 109 S.Ct. at 1254, 103 L.Ed.2d at 498; see also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983). In Nursing Home & Hospital Union No. 434 AFL-CIO-LDIU by Mackson v. Sky Vue Terrace, Inc., 759 F.2d 1094, 1097 (3d Cir.1985), the Court of Appeals for the Third Circuit, quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409, 1417 (1960), held that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

II.
Armed with the above principles, we are convinced that plaintiff's claims against defendant are properly arbitrable before the NASD. It is undisputed that in executing the Form U-4, plaintiff "agree[d] to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time," and "to comply with all *406 provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the jurisdictions and organizations as they are or may be adopted, or amended from time to time." Moreover, it is undisputed that the NASD is one of the organizations referred to in Item 10.
In November, 1991, when plaintiff executed his Form U-4, Section 1 of the NASD Code of Arbitration Procedure (NASD Code) provided:
for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company:
(1) between or among members;
(2) between or among members and public customers, or others; and
(3) between or among members, registered clearing agencies....
[See Pitter v. Prudential Life Ins. Co. of Am., 906 F. Supp. 130, 132 (E.D.N.Y. 1995).]
Section 8(a) of the NASD Code, entitled "Required Submission," at that time provided:
Any dispute, claim or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), shall be arbitrated under this Code, at the instance of:
(1) a member against another member;
(2) a member against a person associated with a member or a person associated with a member against a member; and
(3) a person associated with a member against a person associated with a member.
[See Pitter, supra, 906 F. Supp. at 132-33.]
Sections 1 and 8 of the NASD Code were amended on October 1, 1993. In pertinent part, Section 1 of the NASD Code as amended provides:
This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(3) of the By-Laws of the National Association of Securities Dealers, Inc., (the Association) for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member. ...

*407 [NASD Code of Arbitration Procedure ¶ 3701 (1995) (emphasis added).]
The revised Section 8(a) of the NASD Code, in pertinent part, provides:
Any dispute, claim, or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the insistence of:
(1) a member against another member;
(2) a member against a person associated with a member or a person associated with a member against a member; and,
(3) a person associated with a member against a person associated with a member.
[NASD Code of Arbitration Procedure ¶ 3708 (1995) (emphasis added).]
Thus, the NASD Code, as amended in 1993, explicitly provided that disputes arising out of the employment or termination of employment of an associated person with a member should be submitted to arbitration. The language of the October 1, 1993, amendment to the NASD Code was clear and unambiguous and should have been enforced as written. We find that compelling arbitration under these circumstances is neither unfair nor inequitable and does not deprive plaintiff of any fundamental or substantive rights.
It is uncontroverted that plaintiff's claims and the conduct which gave rise to them occurred after October 1, 1993, when the NASD amendments were in full force and effect. Consequently, plaintiff's claims were subject to the NASD amendments. The trial court should have ordered that such claims be arbitrated before the NASD and should have stayed this action pending completion of the NASD arbitration proceeding.
Our decision is supported by the recent holding of the Court of Appeals for the Ninth Circuit in Kuehner v. Dickinson & Co., 84 F.3d 316 (9th Cir.1996). There, the defendant had hired the plaintiff as a securities sales representative on September 14, 1992 and then fired plaintiff on November 18, 1992. Id. at 317-18. Significantly, the plaintiff "had registered with the [NASD] at the *408 beginning of her employment by signing a Form U-4" in 1992 which contained an arbitration provision like that contained in the Form U-4 signed by plaintiff in the instant matter. Id. at 318. The plaintiff sued the defendant on November 17, 1993, for violations of the Fair Labor Standards Act and for her alleged wrongful discharge under California tort law. Id. at 317. The district court had found that the plaintiff had "entered an enforceable arbitration contract, that the new NASD rule governed [the plaintiff's] suit, and that even if it did not, the old NASD rule required arbitration." Id. at 318.
On appeal, the plaintiff conceded that the new NASD rules required arbitration of employment disputes, but contended "that under the Form U-4 the old NASD rule governs." Id. at 320. The plaintiff argued that she should not be compelled to submit her claims to arbitration due to the fact that her termination occurred before October 1, 1993, when the new NASD amendments became effective. Ibid. The Ninth Circuit disagreed and held that the new NASD rule governs, in part, stating:
Kuehner agreed in signing the Form U-4 to be bound by the NASD rules "as may be amended from time to time." A new procedural rule will usually govern suits filed after its effective date regardless of when the relevant conduct occurred. Landgraf v. USI Film Prods., [511 U.S. 244] ___, 114 S.Ct. 1483, 1502, 128 L.Ed.2d 229 (1994). Although we have not yet addressed the issue, two district courts have applied the new NASD rule to suits filed after October 1, 1993, even though the relevant conduct occurred earlier. See Pitter v. Prudential Life Ins. Co., 906 F. Supp. 130, 134-35 (E.D.N.Y. 1995) (directing arbitration of Title VII claim on the grounds that "it is entirely appropriate to hold Pitter to compliance with non-substantive rules that took effect almost six months before he filed his lawsuit"); Wojcik v. Aetna Life Ins., 901 F. Supp. 1282, 1289 (N.D.Ill. 1995) (directing arbitration of state fraud and contract claims because "Wojcik filed his claim after the effective date of the [new NASD rule]").
* * * * * * * *
The new NASD rule governs under the Form U-4. Because the rule does not affect Kuehner's substantive rights, and because Kuehner sued Dickinson & Co. after October 1, 1993, the date the new rules became effective, the rule requiring arbitration governs Kuehner's suit.
[Kuehner, supra, 84 F.3d at 320-21.]
Here, an even stronger case is presented for the application of the amended NASD Code, than that presented in Kuehner, supra, *409 since plaintiff's claims and the conduct giving rise to them occurred after the adoption of the 1993 amendments to the NASD Code. In Kuehner, supra, the only relevant conduct that occurred after the adoption of the 1993 amendments was the filing of the suit, and yet the Ninth Circuit was still unwilling to allow the plaintiff to escape the arbitration provision.
Other cases have similarly compelled the arbitration of employment disputes where the filing of the claim occurred after the adoption of the 1993 amendments to the NASD Code. See Wojcik v. Aetna Life Ins. & Annuity Co., 901 F. Supp. 1282, 1288-89 (N.D.Ill. 1995) (holding that since employee filed his claim after effective date of the amendments, employee could be subjected to arbitration); Pitter v. Prudential Life Ins. Co. of Am., supra, 906 F. Supp. at 134 (holding it entirely appropriate to compel plaintiff's compliance with non-substantive rules that took effect almost six months before lawsuit was filed); Scher v. Equitable Life Assurance Soc'y of United States, 866 F. Supp. 776, 778 (S.D.N.Y. 1994) (holding that employee must comply with the NASD Code as it existed at the commencement of the action); Moore v. Interacciones Global, Inc., No. 94 CIV. 4789(RWS), 1995 WL 33650 at [*]6 (S.D.N.Y. Jan. 27, 1995) (compelling arbitration where case was filed nine months after amendments' effective date); see also Hall v. MetLife Resources/Div of Metropolitan Life Ins. Co., No. 94 CIV. 0358(JFK), 1995 WL 258061 at [*]4 (S.D.N.Y. May 3, 1995).
In our view the trial court's reliance upon Farrand v. Lutheran Brotherhood, 993 F.2d 1253 (7th Cir.1993), Kresock v. Bankers Trust Co., 21 F.3d 176 (7th Cir.1994), and Prudential Insurance Co. of America v. Lai, 42 F.3d 1299 (9th Cir.1994), cert. denied, ___ U.S. ___, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995), to support its conclusion was misplaced. These cases are distinguishable from the instant matter because in all three cases, the relevant conduct giving rise to the claims occurred prior to the 1993 amendments to the NASD Code.
For example, in Kresock, supra, the defendant-employer fired the plaintiff-employee more than two years before the 1993 *410 amendments to the NASD Code became effective and plaintiff's suit itself was filed before the amendments became effective. Significantly, in Kresock, supra, the Seventh Circuit, in refusing to compel arbitration, emphasized that the 1993 amendments to the NASD Code became effective
four years after Kresock signed the Form U-4, more than two years after Bankers Trust fired her, and nearly a year after Kresock filed this lawsuit. Thus, the relevant conduct took place long before these amendments to the NASD's Code of Arbitration Procedure became effective. They do not apply retroactively to Kresock's case.
[21 F.3d at 179.]
By contrast, all of the relevant conduct underlying plaintiff's claims, with the sole exception of the signing of the Form U-4, occurred more than one year after the amendments to the 1993 NASD Code became effective. Farrand, supra, and Lai, supra, are similarly distinguishable from the case here on appeal.
Consequently, we hold that plaintiff is bound by the terms of the 1993 NASD Code amendments with respect to the postamendment conduct which gave rise to his employment-related dispute with defendant, and, therefore, plaintiff must arbitrate his employment-related disputes with defendant before the NASD. We need not specifically address those cases which have disagreed with Farrand, supra, and its progeny, and have held that the NASD Code, even as it existed prior to the 1993 amendments, was sufficiently broad to mandate the arbitration of employment disputes. See Kidd v. Equitable Life Assurance, Soc'y of United States, 32 F.3d 516, 518-20 (11th Cir.1994); see also Moore v. Interacciones Global, Inc., supra, No. 94 CIV. 4789(RWS), 1995 WL 33650 at [*]4; O'Donnell v. First Investors Corp., 872 F. Supp. 1274, 1278 (S.D.N.Y. 1995); Chisolm v. Kidder, Peabody Asset Management, Inc., 810 F. Supp. 479, 480 n. 2 (S.D.N.Y. 1992); F.N. Wolf & Co., Inc. v. Bowles, 160 Misc.2d 752, 610 N.Y.S.2d 757, 759-60 (N.Y. Sup. Ct. 1994).

*411 III.
Plaintiff also contends for the first time on appeal that he is not obligated to submit his dispute with defendant to arbitration because he never actually signed a Form U-4 with defendant Commodities Corporation (U.S.A.).
It is a well-settled principle that appellate courts "will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available `unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548, 156 A.2d 737 (App.Div. 1959)), certif. denied, 31 N.J. 554, 158 A.2d 453 (1960); Skripek v. Bergamo, 200 N.J. Super. 620, 629, 491 A.2d 1336 (App.Div. 1985), certif. denied, 102 N.J. 303, 508 A.2d 189 (1985); Ferraro v. Demetrakis, 167 N.J. Super. 429, 431-32, 400 A.2d 1227 (App.Div.), certif. denied, 81 N.J. 290, 405 A.2d 834 (1979). Plaintiff did not raise this issue before the trial court and the trial court did not decide the issue. Therefore, this issue is not properly before this court.
However, even if we were to ignore this necessary and fundamental principle of appellate review and consider this issue, it is clear on this record that plaintiff had an obligation to arbitrate employment-related disputes with defendant even though defendant Commodities Corporation (U.S.A.) did not execute the Form U-4. Plaintiff's obligation to arbitrate his employment-related disputes with defendant is based on the NASD rules with which he agreed to comply by signing a Form U-4 with STL, defendant's assignor, thereby requiring him as a registered securities principal to arbitrate all disputes with his employer. See McMahan Sec. Co. L.P. v. Forum Capital Markets L.P., 35 F.3d 82, 86-88 (2d Cir.1994); see also Prudential Ins. Co. of Am. v. Shammas, 865 F. Supp. 429, 431 (W.D.Mich. 1993).
*412 As pointed out above, plaintiff was initially employed by STL, a subsidiary of defendant, and was responsible for managing STL's trading activities. STL is the sole general partner of Hamilton. All trading activities by and on behalf of Hamilton were performed by employees of STL, including plaintiff. Hamilton had no employees of its own. Subsequently, all personnel, including plaintiff, and all assets of STL's New York office were assigned to defendant. Thereupon, defendant became Hamilton's investment advisor and agent to effect all securities transactions on Hamilton's behalf and plaintiff became an employee of defendant and continued to perform the same services as before the assignment.
In this capacity, plaintiff managed the trading for Hamilton, a SEC registered broker-dealer, and NASD member. The fact that the name of plaintiff's employer changed, or that his employment contract was assigned, did not nullify or change his obligation to comply with the NASD rules and regulations, including the NASD Arbitration Code. Plaintiff executed his Form U-4 and registered with the NASD because his duties, that is, managing Hamilton's trading, whether as an employee of STL or as an employee of defendant, required him to do so.
The Form U-4 signed by plaintiff states: "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time...." The NASD is one of the organizations indicated in Item 10. Section 8(a) of the NASD Code as amended in 1993 provides that
[a]ny dispute, claim, or controversy ... between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s) or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code....
[NASD Code of Arbitration Procedure, ¶ 3708 (1995).]
Defendant, as plaintiff's employer in the securities industry, necessarily is one of the "others" with whom plaintiff, an NASD *413 "associated person," is required to arbitrate under the NASD Code. The NASD By-Laws define an "associated person of a member" as, inter alia, "every ... branch manager of any member, ... or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member." NASD By-Laws Art. I(q), ¶ 1101(m) (1994). In McMahan Securities Co. L.P. v. Forum Capital Markets L.P., supra, 35 F.3d at 87-88, the Court of Appeals for the Second Circuit compelled arbitration of an associated person's disputes with an entity closely affiliated with an NASD member. The Second Circuit held that the closely-affiliated entity, a registered investment advisor, was "sufficiently immersed in the underlying controversy", that it fell within the list of those persons and entities who could be compelled to submit their claims to arbitration under the terms of sections 1 and 8(a) of the NASD Code, supra. Id. at 87-88. The McMahan court reasoned that:
A person who is neither a member nor an associated person is nevertheless appropriately joined in [an] arbitration where that party plays an active role in the securities industry, is a signatory to a securities-industry arbitration agreement (or is an instrument of another party to the arbitration), and has voluntarily participated in the particular events giving rise to the controversy underlying the arbitration.
[Id. at 88.]
Pursuant to an assignment from STL, Hamilton's sole general partner, defendant alone served Hamilton as its investment advisor, and conducted Hamilton's trading as its agent. Plaintiff supervised such trading as an employee/manager of defendant. Clearly, defendant was affiliated under common ownership with Hamilton's general partner, STL. In asserting his wrongful termination claim against defendant in this action, plaintiff placed defendant at the center of the dispute involving the trading of Hamilton's assets that he supervised. See Fleck v. E.F. Hutton Group, Inc., 891 F.2d 1047, 1054 (2d Cir.1989). Defendant's relationship with Hamilton was so close and so intertwined that any claim against defendant should appropriately be arbitrated under the agreement executed by plaintiff. Compare Pritzker v. *414 Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121-22 (3d Cir.1993); Nesslage v. York Sec. Inc., 823 F.2d 231, 233-34 (8th Cir.1987); Interocean Shipping Co. v. National Shipping & Trading Corp., 523 F.2d 527, 539 (2d Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).
To adopt plaintiff's "privity" argument, would render meaningless the language of the NASD Code, which requires arbitration of employment-related disputes, since Hamilton, the entity he contends is his firm for Form U-4 arbitration purposes, has no employees and undertakes all of its trading through defendant. The reason that plaintiff registered with the NASD was that it was a legally-mandated condition of undertaking his employment responsibilities and duties managing Hamilton's trading, first as an employee of STL, and then as an employee of defendant. Plaintiff's registration with the NASD was an integral part of his relationship with both STL and defendant. Thus, by the terms of the Form U-4 which he signed, plaintiff was obligated to arbitrate his employment-related disputes with his employer-defendant, even though defendant did not execute the Form U-4 as plaintiff's employer. See Pitter v. Prudential Life Ins. Co. of Am., supra, 906 F. Supp. at 132 n. 2; see also Prudential Ins. Co. of Am. v. Shammas, 865 F. Supp. at 430-31. Much like the relationship between Prudential and Pruco Securities Corporation described in Pitter v. Prudential Life Ins. Co. of America, supra, STL and defendant are both under substantially common control and ownership. See Foley v. Presbyterian Ministers' Fund, No. CIV A-90-1053, 1992 WL 63269 at [*]2 (E.D.Pa. Mar. 19, 1992); see also Lombard Sec. Inc. v. Thomas F. White & Co., Inc., 903 F. Supp. 895, 898 (D.Md. 1995).
Furthermore, the persons with whom plaintiff was required to arbitrate under Section 8(a) of the NASD Code are not limited to "his firm" or "associated persons"  a term that includes corporations and partnerships as well as individuals. See McMahan Sec. Co. L.P. v. Forum Capital Markets L.P., supra, 35 F.3d at 87-88. On the contrary, plaintiff is required to arbitrate with defendant. *415 Plaintiff's original employer, STL, the sole general partner of Hamilton and an affiliate of defendant, is an "associated person" under the NASD Code with which plaintiff is required to arbitrate disputes. It would exalt form over substance to hold that the assignment of plaintiff's employment contract by STL to its affiliate defendant would eliminate plaintiff's obligation to the NASD to arbitrate his disputes with his employer. Such a ruling would create chaos in the securities industry, where firms frequently merge, consolidate or otherwise change their corporate structure or name, and where, as is the case with plaintiff, their employees continue to function in precisely the same manner.

IV.
Finally, we are satisfied that, contrary to plaintiff's claim, the appeal is not rendered moot by the NASD's decision of December 15, 1995, which determined that defendant cannot compel plaintiff to arbitrate the pending dispute and which thus removed defendant as a party in that matter. In reaching this decision, the NASD stated:
Please be advised that the Director of Arbitration has reviewed and considered all documentation submitted by the parties regarding Respondent's Motion to Dismiss the above referenced matter.
Respondent Jonathan Singer's Motion to Dismiss has been denied. Pursuant to Article I Section 1101 subsection (q) of the By-Laws of the NASD Manual, which states in relevant part, that an associated person of a member firm may be "... any natural person engaged in the.... securities business who is directly or indirectly controlling or controlled by such member, whether or not any such person is registered or exempt from registration ...". Therefore, due to the fact that Respondent Singer was an associated person of Hamilton Partners, a NASD member firm, Respondent Singer can be compelled to arbitrate disputes arising out of his employment for Hamilton Partners.
However, Commodities Corporation USA, a non NASD member firm, is being removed as a Claimant in the above reference matter. Pursuant to Sections 1 and 8 of the NASD Code of Arbitration Procedure, Respondent Singer can only be compelled to arbitrate a dispute at the instance of another Member Firm or an Associated Person. Claimant, Commodities Corporation USA, is not a member firm of the NASD, nor are they an Associated Person as provided for by the By-Laws of the NASD, Article I, Section 1, Paragraph 1101(q). In view of the above, absent a court order compelling Respondent Singer to arbitrate this dispute and/or the filing of a Commodities Corporation USA predispute arbitration agreement to *416 arbitrate this dispute signed by Jonathan Singer, Commodities Corporation USA cannot compel Jonathan Singer to arbitrate this dispute. Therefore, Commodities Corporation USA is being removed as a party in the above matter.
Please be advised that since the NASD, Inc. will honor any properly obtained court order, there is no need to name the NASD in the event that a party attempts to obtain said court order.
Parties may, in their discretion, reassert these issues with the panel of arbitrators.
First, there is nothing in the Form U-4 requiring that arbitration between plaintiff and defendant take place before the NASD, although the NASD is the most logical arbitration forum. The arbitration clause contained in the Form U-4 defines those disputes that plaintiff is required to arbitrate and with whom. It does not determine where the arbitration must take place. Thus, the NASD's decision which determined that defendant cannot compel plaintiff to arbitrate this dispute before it and, therefore, removed defendant as a party to the arbitration, involved no more than the question of where that required arbitration may take place.
Second, it is significant that the NASD's December 15, 1995, decision removing defendant as a party to the pending arbitration, expressly stated that the NASD will "honor any properly obtained court order" compelling plaintiff to arbitrate this dispute. Moreover, the NASD reserved to the parties the right to reassert the issues raised on plaintiff's motion to dismiss with the panel of arbitrators. Thus, not only is the NASD decision subject to review by the NASD panel of arbitrators, but it is also subject to reversal or change by a court order compelling arbitration. Since we hold that plaintiff's employment-related claims against defendant are arbitrable and that defendant is a proper party to the NASD arbitration, we direct that such claims be arbitrated before the NASD, the most logical arbitration forum.

V.
Accordingly, the orders under review are reversed. Plaintiff is ordered to submit his employment-related disputes to arbitration before the NASD and this action in the Law Division is stayed *417 pending completion of the NASD arbitration. We do not retain jurisdiction.